NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

FELISHA L., *Appellant*,

v.

DEPARTMENT OF CHILD SAFETY, D.C., *Appellees*.

No. 1 CA-JV 19-0050
FILED 10-10-2019

Appeal from the Superior Court in Maricopa County
No.  JD22897
The Honorable Sara J. Agne, Judge

**AFFIRMED**

COUNSEL

Czop Law Firm, PLLC, Higley
By Steven Czop
*Counsel for Appellant*

Arizona Attorney General's Office, Phoenix
By JoAnn Falgout
*Counsel for Appellee*

---

**MEMORANDUM DECISION**

Judge David D. Weinzweig delivered the decision of the Court, in which Presiding Judge Randall M. Howe and Judge Diane M. Johnsen joined.

---

**W E I N Z W E I G**, Judge:

¶1         Felisha L. ("Mother") appeals the juvenile court's order terminating her parental rights to D.C.  We affirm.

## FACTS AND PROCEDURAL BACKGROUND

¶2         Mother and Kelly C. ("Father")[1] are the biological parents of D.C., born in November 2013.  The Department of Child Safety learned about D.C. shortly after his birth, when he and Mother tested positive for methamphetamines.  Mother told DCS investigators about her long, untreated struggle with substance abuse and mental health issues.  DCS took temporary custody of D.C. and petitioned the juvenile court to find him dependent as to Mother on grounds related to substance abuse.  The court later dismissed the dependency petition on DCS's motion based on Mother's "progress with sobriety," and D.C. was returned to Mother in April 2014.

¶3         Around two years later, DCS learned that Mother had relapsed into methamphetamine abuse. Mother and D.C. were living in the guesthouse of Mother's grandmother ("Grandmother"). DCS found "filthy" and dangerous living conditions with trash strewn on the floor, and drugs and "unsafe products" within D.C.'s reach.  Grandmother alerted DCS to concerns of abuse and neglect.  She reported that Mother had taken D.C. shoplifting.  She also explained that D.C. was "fearful" of Mother because Mother would "roughly" grab his hair and scream at him.

¶4         DCS removed D.C. from Mother and placed him with Grandmother in May 2016, but moved him to another relative in June 2016 after receiving an allegation that D.C. had sexually assaulted another child while in Grandmother's care. DCS then moved him to a licensed foster home in October 2016 after he displayed more sexualized behavior.  D.C.,

---

[1] The court also terminated Father's parental rights.  He later died and is not party to this appeal.

then three years old, was found to have special needs, including "little intelligible speech," displays of aggression to children and adults, and "severe hearing loss in both ears due to chronic, untreated middle ear infections."

¶5            Meanwhile, DCS again petitioned the juvenile court in June 2016 to find D.C. dependent as to Mother on grounds of substance abuse and neglect. DCS alleged that Mother had an "extensive history" of substance abuse, "refused to complete a urinalysis test and a hair follicle test since May 12, 2016," and "neglect[ed] to properly treat her mental health." DCS further alleged that Mother could not provide D.C. with "stable housing," "a safe and stable home environment" or meet his "basic needs, such as food, clothing, shelter and medical care." DCS referred Mother for parent aide services, supervised visitation and parenting classes, but she declined to participate. Additionally, Mother missed a DCS team decision-making meeting and the court's preliminary protective conference.

¶6            Mother was homeless at this point and sought "residential treatment and interim services" during an intake appointment at Lifewell Behavioral Wellness, where she admitted using roughly $20 of methamphetamines daily. Despite Lifewell's efforts, she never participated in the offered services and was then incarcerated for 50 days between July and September 2016 after being indicted on multiple felony counts of Taking the Identity of Another. After released from jail pending her criminal trial, Mother remained disengaged and abruptly left a child-family team meeting because it was "too hectic."

¶7            The court held a hearing on the dependency petition in November 2016. Mother did not appear. DCS offered 13 exhibits into evidence. The court found that Mother had no good cause for missing the hearing and waived her right to contest the dependency allegations. It ultimately found D.C. dependent as to Mother on the grounds alleged and adopted a case plan of "family reunification concurrent with severance and adoption." Though Mother had not engaged in services, the court ordered that DCS offer her visitation, along with random drug testing and parent aide services.

¶8            Mother pleaded guilty to the earlier felony counts and was reincarcerated in January 2017. According to DCS reports, she had still not engaged in "any services," had "not maintained any contact with [DCS] to inquire about" the child and had not verified stable housing or employment.

¶9            The court then changed the case plan to severance and adoption, and DCS moved in June 2017 to terminate Mother's parental rights on several grounds, including abandonment, substance abuse and nine-months in out-of-home placement.  In April 2018, DCS amended its motion to include fifteen-months in out-of-home placement.

¶10          The hearing was delayed and did not commence until October 2018.  In the interim, and over DCS's objection, the juvenile court ordered that Mother and D.C. have two supervised visits.  D.C. twice visited Mother in prison (April and June 2018), and they once spoke on the telephone (March 2018).  D.C. did not immediately recognize Mother, but they interacted. D.C.'s behavior significantly regressed after both in-person visits.  His foster parents and teacher reported "extreme tantrums."  And he suffered frequent nightmares, had trouble focusing and "panic[ked]" if left alone.  D.C. also described the second visit as "scary."  The court suspended further visitation until Mother finished her prison sentence.

¶11          Mother was released from prison in September 2018. She returned to live with Grandmother in the same house that contributed to D.C.'s removal.  DCS then arranged for Mother to visit D.C. on Monday and Wednesday of each week.  The court granted Mother additional visitation time because DCS had waited two weeks after her release to arrange visitation.  Given this two-week lapse, the court certified DCS reunification efforts in October 2018, but "crossed-out" case management services and visitation services.

¶12          Thereafter, Mother consistently attended group therapy, focusing on communication and managing emotions.  She also passed 19 drug tests from October to December 2018. D.C. displayed more behavioral problems after her release, including aggression towards classmates and extreme sexualized behaviors.

¶13          The court held a contested four-day severance hearing in October and December 2018, and heard testimony from eight witnesses, including Mother, the case manager, D.C.'s teacher and a psychologist. The court terminated Mother's parental rights to D.C. on the ground of nine-months in out-of-home placement, but declined termination based on substance abuse, abandonment, or fifteen-months in out-of-home placement. The court recounted Grandmother's earlier reports of Mother's abuse and neglect, including that D.C. witnessed "terrible and inappropriate sexual things" under Mother's care.  The court also found that DCS made reasonable and diligent efforts to effectuate reunification of the family.

**¶14**      Mother timely appealed. We have jurisdiction pursuant to A.R.S. § 8-235(A).

## DISCUSSION

**¶15**      To terminate parental rights, the juvenile court must find clear and convincing evidence of a statutory ground in A.R.S. § 8-533(B) and that termination is in the child's best interests by a preponderance of the evidence. *Kent K. v. Bobby M.*, 210 Ariz. 279, 288, ¶ 41 (2005). We will affirm a severance order unless it is clearly erroneous, and we accept the court's factual findings unless no reasonable evidence supports them. *Jesus M. v. Ariz. Dep't of Econ. Sec.*, 203 Ariz. 278, 280, ¶ 4 (App. 2002).

**¶16**      Mother raises three arguments on appeal. She first argues the termination order is internally irreconcilable because the juvenile court rejected the fifteen-months in out-of-home placement ground for severance, which she asserts carries a "diminished" burden, but accepted the nine-months in out-of-home placement ground, which she asserts carries a "high finding of parental misconduct."

**¶17**      We find no inconsistency in the court's decision. Although both grounds hinge on a child's time in DCS custody, the nine-month and fifteen-month grounds are independent bases for termination with distinct requirements. Termination is permitted on nine-months if "the parent has substantially neglected or willfully refused to remedy the circumstances that cause . . . an out-of-home placement," A.R.S. § 8-533(B)(8)(a), while termination is permitted on fifteen-months if the parent has not "remed[ied] the circumstances" *and* is substantially likely to remain "[in]capable of exercising proper parental care in the near future," A.R.S. § 8-533(B)(8)(c). As applied here, the court found that Mother had not remedied the circumstances that caused D.C.'s removal, but could not find clear and convincing evidence that Mother would be unable to parent in the near future based on her testimony and post-release engagement in services. Simply put, the court's lack of certainty about Mother's parenting prospects in the near future under the fifteen-month ground does not defeat its finding under the nine-month ground that Mother "substantially neglected to remedy the circumstances" in the past.

**¶18**      Mother next contests the factual basis for the court's finding that she "substantially neglected to remedy the circumstances" causing D.C.'s out-of-home placement. We are not persuaded. The record includes reasonable evidence to support the court's decision. Mother made virtually no effort to "remedy the circumstances" after D.C. was first removed. She

had 201 days from D.C.'s removal until her ultimate incarceration to pursue substance abuse treatment, visitation, undergo drug testing and attend parenting classes. Aside from her attendance at one intake appointment, she declined. As for her time in prison, the court found "no evidence" that Mother completed relevant programs. And most recently, after she was released from prison, Mother returned to live at Grandmother's house, "the same environment in which [D.C.] appears—from all credible evidence—to have acquired significant trauma." The DCS case manager thus testified it was "really difficult to articulate that Mother has made any behavioral changes towards stability or sobriety." At any rate, Mother simply points to more favorable evidence for her position, but we do not reweigh the evidence on appeal. *Alma S. v. Dep't of Child Safety*, 245 Ariz. 146, 151, ¶¶ 18-19 (2018). We find no abuse of discretion.

¶**19** Lastly, Mother argues the court erred in finding that DCS made "diligent effort[s] to provide appropriate reunification services," A.R.S. § 8-533(B)(8). But the record contains reasonable evidence to find that DCS made diligent efforts in providing Mother the "opportunity to participate in programs designed to improve [her] ability to care for the child." *Mary Ellen C. v. Ariz. Dep't of Econ. Sec.*, 193 Ariz. 185, 192, ¶ 37 (App. 1999). Although Mother argues DCS balked at allowing D.C. to visit her in prison, it arranged such visits and asked to terminate them only after they proved upsetting to the child. Otherwise, Mother was offered or provided an assortment of services, including substance abuse assessment and treatment, drug testing, visitation, transportation services, parenting classes, allowance and subsidies, case management services, medical and dental services and parent aide services. That is why the court consistently found, without Mother's objection and with only one exception, that DCS satisfied the "diligent efforts" requirement after D.C.'s removal.

## CONCLUSION

¶**20** We affirm.



AMY M. WOOD • Clerk of the Court
FILED: AA